## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

WESTERN ORGANIZATION OF RESOURCE
COUNCILS,

*Plaintiff*,

*vs.*

DAN BROUILLETTE, in his official capacity as
Secretary of Energy, and UNITED STATES
DEPARTMENT OF ENERGY,

*Defendants*.

Case No. CV-20-98-GF-BMM

COMPLAINT

## INTRODUCTION

1.      This case challenges the Department of Energy's recent

administration of the National Coal Council ("NCC" or "Council"), a body

designed to debate and recommend federal policies related to the production and

consumption of American coal. This broad mandate directly implicates the

interests of landowners, ranchers, conservationists, and outdoor enthusiasts who

live, work, and recreate near coal deposits and infrastructure.

2.      Rather than pursue its task with the full and transparent participation

of these voices, the Council has operated in secret and works to advance the goals

of only one interest: the industries that profit from the development and

combustion of coal.

3.      In the absence of diverse, competing viewpoints and meaningful public participation, the Council has since 2017 proffered a bevy of recommendations designed to increase coal extraction across the United States. These recommendations threaten a catastrophic wave of irresponsible coal mining and consumption, with associated public health effects from air and water pollution.

4.      The NCC's brand of one-sided, clandestine decisionmaking is not sanctioned by Congress, which passed the Federal Advisory Committee Act ("FACA") as a "sunshine law" to ensure that advisory committees such as the NCC operate transparently and with public participation.

5.      Specifically, FACA Section 10 requires that the NCC operate in the open and with public input. *See* 5 U.S.C. App. 2 § 10. The Council's current, lopsided membership has disregarded these requirements: Defendants have not properly disclosed numerous materials on which the Council has relied for its post-2017 analysis and recommendations and have unlawfully closed Council meetings. This decisionmaking process belies any meaningful attempt to consider the significant range of public opinion on domestic coal policy.

6.      Plaintiff is a Montana-based membership organization representing ranchers, landowners, and other interested parties in states where coal is extracted and transported. Plaintiff and its membership therefore have a direct stake in

Defendants' current flouting to the decisionmaking processes required by FACA, and in the injurious federal policies advanced by the NCC.

7.      Plaintiff has sought greater access to the NCC's meetings and documents for several months. Defendants have not provided legally sufficient responses to Plaintiff's requests, much less complied with their obligations under FACA Section 10.

8.      Accordingly, Plaintiff brings this action for declaratory and injunctive relief. Defendants' violations of FACA warrant an order requiring release of NCC materials and an injunction prohibiting the NCC from operating until it complies with FACA Section 10.

## PARTIES

9.      Defendant DAN BROUILLETTE is the Secretary of Energy, and has ultimate authority over the NCC's formation, composition, administration, and termination. He is sued in his official capacity.

10.     Defendant UNITED STATES DEPARTMENT OF ENERGY ("Department") is an agency within the executive branch of the federal government responsible for development of energy technology and other policies related to the nation's energy supply and use.

11.     Plaintiff WESTERN ORGANIZATION OF RESOURCE COUNCILS ("WORC"), headquartered in Billings, Montana, is a regional network

of grassroots community organizations including 18,132 members and 39 local chapters across seven states. WORC's mission is to build sustainable environmental and economic communities that balance economic growth with public health and stewardship of land, water, and air resources.

12.     WORC's members farm and ranch on lands overlying and neighboring federal, state, and privately owned coal, oil, and gas deposits, and experience numerous adverse impacts from coal mining and development, including water pollution, deterioration of air quality and associated health effects, and destruction of recreational areas. WORC and its member groups, which together form a federation, have a longstanding interest in mining, drilling, leasing, and royalty policy as it pertains to coal deposits, and for over 35 years have actively engaged in advocacy in this area.

13.     WORC brings this action on its own behalf. An important component of WORC's mission is educating and informing its members about the ways in which their interests are affected by federal policy on public lands and minerals. Thus, WORC routinely updates its membership concerning proposed rulemaking, legislation, and other policy developments. For example, WORC has updated its members through action alerts, blog postings, newsletter articles, and monthly mailings concerning the pending Office of Surface Mining Reclamation and Enforcement proposal to weaken federal oversight and enforcement of state

compliance with approved mining programs, proposals for federal bailouts for the coal industry, inadequate consideration of the climate impact of federal coal leasing policy, and relevant federal advisory committees, such as the Department of the Interior's Royalty Policy Committee

14.     WORC's capacity to provide updates to its membership is compromised when the government relies on opaque and procedurally flawed advisory committees to shape executive rulemaking. Absent the disclosures required by FACA (particularly the statute's requirements for open meetings and records), WORC is unable to adequately inform its members about the Council's deliberations and proposals, such that WORC and its membership cannot meaningfully participate in Council processes and other agency actions.

15.     WORC has a direct interest in and is directly affected by the NCC's work. Plaintiff's membership is injured when the federal government encourages overdevelopment of the coal resources underlying or abutting the memberships' properties. For example, coal extraction activities disturb nearby environs with machinery that emits noise, water, and air pollution, and mining practices (such as "longwall mining") that can literally split open the earth.

16.     Thus, an expansion or deregulation of coal mining will increase the likelihood that WORC's membership will suffer damages to farm and ranch land; that residents living near coal will experience air pollution, reductions in water

quality and/or quantity; that ranchers will lose grazing permits and tourism-related income; and that westerners who hunt, fish and recreate on lands nearby coal development will suffer reduced access and/or reductions in wildlife. Plaintiff's membership includes many such landowners, ranchers, and recreationists.

17.     The NCC has already recommended several policies that contribute to these injuries and thereby directly implicate WORC's mission. *See infra* ¶¶ 73-81.

18.     WORC is also injured by Defendants' failure to comply with FACA Section 10, which impedes Plaintiff's access to information it is entitled to by law.

19.     On May 27, 2020, WORC wrote Secretary Brouillette seeking membership on the NCC and three categories of material that Defendants must release to the public under FACA Section 10: (1) minutes of Council meetings, including records of how Council reports and recommendations were drafted and approved; (2) information regarding Council subcommittees or any other Council entities (such as study groups), including subcommittee membership and minutes of subcommittee meetings; and (3) any materials produced by the Council's corporate alter ego NCC, Inc., and transmitted to some or all of Council membership. Ex. A at 3. *See generally infra* ¶¶ 48-60 (describing NCC, Inc.).

20.     WORC further explained that "under FACA and its implementing regulation[s]," WORC's requests "[were] not a mandatory prerequisite to securing

the Department's compliance with [FACA Section 10]," and that "WORC [was]
therefore submitting [its] requests purely as a courtesy." Ex. A at 3.

21.    Finally, WORC requested that Defendants open NCC meetings to the
public as required by FACA Section 10.

22.    Approximately six weeks later, on July 15, 2020 the Department of
Energy responded with a letter describing WORC's request as one under the
Freedom of Information Act ("FOIA") and seeking information from WORC that
might be relevant to a FOIA request. *See* Ex. B.

23.    WORC responded on July 21, 2020, reiterating that it had made its
request under FACA Section 10, not FOIA, and requesting that Defendants comply
with FACA Section 10 immediately.

24.    On September 9, 2020—three months after Plaintiff first wrote to
Defendants—the Department of Energy conceded that, "upon further review" of
WORC's letter, Plaintiff's request for materials fell under FACA Section 10(b).
However, the Department did not agree to release the materials sought by Plaintiff.
*See* Ex. C. It later posted Council minutes and agendas to a new NCC website.

25.    Defendants' noncompliance with FACA Section 10 directly impedes
Plaintiff's work on behalf of its members, as set forth above. Without full access to
the NCC's materials, Plaintiff lacks a crucial window onto important federal
policymaking.

26.     Because Defendants are responsible for all aspects of the Council's operations, Defendants are responsible for the NCC's failure to release NCC records and open NCC proceedings. 5 U.S.C. App. 2 §§ 8-10.

27.     A favorable decision from this Court will redress Plaintiff's injuries by requiring that the Council operate in a fashion comporting with FACA and allowing Plaintiff and its membership to follow and participate in Council meetings consistent with Section 10 of the Act.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically FACA, 5 U.S.C. § App. 2, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

29.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) because Plaintiff resides in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

30.     To take only one example of the connection between Montana, Plaintiff's membership, and the NCC, the Council has traditionally included multiple members or contributors representing Burlington Northern Santa Fe ("BNSF") railway, on which the coal industry depends to ferry coal from mines in North Dakota, Wyoming, and Montana to powerplants elsewhere in the country

and to crucial export terminals like that in Westshore, British Columbia.[1] BNSF rail hubs such as Great Falls, Montana, are vital for this transit, which accounts for 70% of all coal transportation in the United States.[2] These rail hubs thereby directly facilitate coal mining near Plaintiff's membership and also threaten nearby public lands with risks of derailment and associated pollution.[3]

## LEGAL BACKGROUND

### I.   The Federal Advisory Committee Act

31.   "The Federal Advisory Committee Act . . . was enacted in 1976 with Congress' recognition that many committees, boards, commissions, and other groups provide the executive branch with valuable expert advice, ideas and opinions." *PETA v. Barshefsky*, 925 F. Supp. 844, 847 (D.D.C. 1996). "However, Congress was also cognizant of the fact that many advisory committees were created without adequate justification," *id.*, a failing that had accelerated the creation of new committees, diluted public and congressional oversight of those

---

[1] *See, e.g.*, National Coal Council, *Advancing U.S. Coal Exports: An Assessment of Opportunities to Enhance Exports of U.S. Coal*, 14-18 (2018), https://www.nationalcoalcouncil.org/studies/2018/NCC-US-Coal-Exports-2018.pdf.
[2] *Id.* at 11; *Coal Map*, BNSF Railway (August 2013), https://www.bnsf.com/ship-with-bnsf/maps-and-shipping-locations/pdf/coal_energy.pdf (providing overall view of the BNSF network serving the coal industry, including rail hubs in Montana).
[3] *See, e.g.*, *Coal Train Derailment Offers Lesson on Danger of Fossil Fuel on Rails*, WORC (Jan. 10, 2019), http://www.worc.org/coal-train-derailment-offers-lesson-on-danger-of-fossil-fuel-on-rails/; USDA, *Volume 1—Final Environmental Impact Statement for the Land Management Plan: Flathead National Forest* 74 (2018), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd603491.pdf (detailing risk to Flathead National Forest groundwater from nearby coal transportation).

committees, and positioned special interests to surreptitiously direct federal policymaking.

32.     FACA was designed to arrest these trends and "cure . . . the wasteful expenditure of public funds for worthless committee meetings and biased proposals[.]" *Pub. Citizen v. DOJ*, 491 U.S. 440, 453 (1989). *See also Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999) ("Congress . . . feared the proliferation of costly committees . . . dominated by representatives of industry and other special interests seeking to advance their own agendas.").

33.     As relevant here, FACA meets these goals by "open[ing] to public scrutiny the manner in which government agencies obtain advice from private individuals and groups." *Wash. Legal Found. v. Am. Bar Ass'n*, 648 F. Supp. 1353, 1358 (D.D.C. 1986) (quotation omitted).

34.     Thus, the committee must provide "timely notice" of its meetings to the public, 5 U.S.C. App. 2 § 10(a)(2), and must allow interested persons to "attend, appear before, or file statements with [the] committee," *id.* § 10(a)(3).

35.     All meetings must be held "in a manner or place reasonably accessible to the public" and permit "[a]ny member of the public [to] speak to or otherwise address the advisory committee if the agency's guidelines so permit[.]" 41 C.F.R. § 102-3.140(a), (d).

36.     Additionally, every advisory committee must publicize "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents . . .  made available to or prepared for" the committee, 5 U.S.C. App. 2 § 10(b).

37.     "In general," General Services Administration ("GSA") regulations exempt advisory committee subgroups from the transparency requirements of FACA Section 10. 41 C.F.R. § 102-3.35(a). But "[i]f a subcommittee makes recommendations directly to a Federal . . . agency, or if its recommendations will be adopted by the parent advisory committee without further deliberations," then the requirements of FACA Section 10 apply. 41 C.F.R. § 102-3.145.

38.     The Department of Energy's Manual further requires that "advisory committees must not make recommendations or give advice with respect to matters not considered by the committee in regular sessions or not within the scope of its functions as set forth in the committee's charter." U.S. Dep't of Energy, Off. of Mgmt., *Advisory Committee Management Program*, DOE M 515.1-1,  Ch. 5 § 2(v) (2007), https://www.directives.doe.gov/directives-documents/500-series/0515.1-DManual-1/@@images/file.

## II.     The Administrative Procedure Act

39.     The APA allows a person "suffering legal wrong because of agency action, or adversely aggrieved by agency action" to seek judicial review of that

action. 5 U.S.C. §§ 702-706. Under the APA, a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," *id.* § 706(2)(A), or that are "without observance of procedure required by law." *Id.* § 706(2)(D). Because FACA does not provide its own standard or scope of review, or a cause of action, this case is properly brought under the standards set forth in the APA. *See* 5 U.S.C. § 701(a).

## FACTUAL BACKGROUND

### I.      Coal in the Global Energy Economy

40.     The Department of Energy plays a critical role in managing development of domestic coal resources. For example, the Department issues competitive awards with a direct effect on coal extraction and production. One Department component crucial for such grants is the National Energy Technology Laboratory, which issued a report earlier this year concluding that coal power plants are "critical" for the reliability and affordability of the nation's electric grid.[4]

41.     The Department also influences domestic coal production and consumption through a variety of authorities under the Department of Energy Organization Act of 1977 ("DOE Act"). For example, Section 405 of the DOE Act,

---

[4] *Additional Pipeline Capacity and Baseload Power Generation Needed to Secure Electric Grid,* National Energy Technology Laboratory (Feb. 20, 2020), https://netl.doe.gov/node/9516.

42 U.S.C. § 7175, grants the Department the ability to intervene or otherwise participate in any proceeding before the Federal Energy Regulatory Commission ("FERC"), which in turn can subsidize coal use and production through a variety of regulations.[5]

42.     Section 403 of the DOE Act, 42 U.S.C. 7173(a), allows the Department to propose regulations to FERC, which *must* consider the Department's request, *id.* § 7173(b). In 2017, the Department relied on this authority to request that FERC require electricity markets to subsidize coal power plants. Grid Resiliency Pricing Rule, 82 Fed. Reg. 46940 (Oct. 10, 2017).[6]

43.     Section 202c of the Federal Power Act ("FPA"), 16 U.S.C. § 824a(c), allows the Department to *require* the use of coal fired power plants in an "emergency." As has been widely reported, Defendants have recently considered using this theory to "bailout" struggling coal fired powerplants nationwide.[7]

---

[5] *See, e.g.*, David Roberts, *The Trump administration just snuck through its most devious coal subsidy yet,* Vox (Dec. 23, 2019), https://www.vox.com/energy-and-environment/2019/12/23/21031112/trump-coal-ferc-energy-subsidy-mopr (describing FERC's coal-friendly regulation of so-called "capacity markets"); Gavin Bade, *Exclusive: Chatterjee details interim plan to save coal, nuclear plants,* Utility Dive (Nov. 15, 2017), https://www.utilitydive.com/news/exclusive-chatterjee-details-interim-plan-to-save-coal-nuclear-plants/511044/ (describing possibility that FERC would require energy markets to rely on coal plants through "must-run" provisions).

[6] *See generally* Shanti Gamper-Rabindran, *Markets, States and the Federal Government in the Transition to Wind Energy: Many Steps Forward, and Recent Steps Backwards,* 33 J. Land Use & Envtl. L. 355, 369 (2018).

[7] *See* Gavin Bade, *Trump administration preparing 2-year coal, nuke bailout*, Utility Drive (June 1, 2018), https://www.utilitydive.com/news/trump-administration-preparing-2-year-coal-nuke-bailout/524788/.

44.     A key conclusion of the aforementioned National Energy Technology Laboratory report—and an important rationale for the Department's recent use of DOE Act Section 403 and its proposed use of FPA Section 202—is that coal generated electricity is more reliable than other sources. This rationale has been widely debunked: there is no grid resiliency emergency, and, assuming there was, coal is not particularly well suited to bolster grid resiliency.[8]

45.     The Department's use of the DOE Act and the FPA, as described above, could significantly increase domestic coal consumption. One study estimated that, if implemented, the Department's proposed rule under DOE Act Section 403 would result in 26 additional gigawatts of electricity from coal-fired powerplants in 2045. Because coal-generated electricity is more expensive than alternative sources and creates much more air pollution, this increased coal generation would cost the American public $263 billion and result in nearly 27,000 additional deaths from pollution-related illnesses.[9]

46.     If the Department continues to use its authority to increase coal consumption in the United States, the natural effect will be an increase in coal production. As the Council of Economic Advisors has concluded in the context of

---

[8] Burcin Unel and Avi Zevin, *Toward Resilience: Defining, Measuring, and Monetizing Resilience in the Electricity System*, Institute for Policy Integrity (2018), https://policyintegrity.org/files/publications/Toward_Resilience.pdf.
[9] *See* Daniel Shawhan and Paul Picciano, *Costs and Benefits of Saving Unprofitable Generators: A Simulation Case Study for US Coal and Nuclear* Plants (Res. for the Future, Working Paper No. 17-22, 2017) at 10-11.

natural gas, "[e]lectricity generation is an important component of creating enough demand to capitalize on American abundance and supporting production[.]"[10]

47.    This increased production, in turn, would fall heavily in areas where Plaintiff and its members are located. Plaintiff has thousands of members in Colorado, Montana, North Dakota, and Wyoming, states whose combined coal output in 2018 accounted for 51% of the nation's total. The Powder River Basin, which spans northeastern Wyoming and southeastern Montana, has for decades accounted for approximately two-fifths of U.S. coal production.

## II.    Structure and objectives of the NCC and NCC, Inc.

48.    The National Coal Council is a federal advisory committee under FACA.[11]

49.    The NCC's mandate is to "provide[] advice and recommendations to the Secretary of Energy on general policy matters relating to coal and the coal industry." Since 2017, the NCC's approach to these "general policy matters" has been solely to promote and advance the coal industry's economic interests, using the imprimatur of the Department of Energy to advocate for favorable policy changes and to advance industry-friendly assessments of the role of coal in the

---

[10] Economic Report of the President & The Annual Report of the Council of Economic Advisors (2019) at 260.
[11] *Advisory Committee Charter*, National Coal Council (2019), https://www.nationalcoalcouncil.org/page-NCC-Charter.html (hereinafter "NCC Charter").

global economy. In short, the NCC currently functions as a federally chartered industry association.

50.     Indeed, the NCC itself is comprised of two legal entities: the federal advisory committee chartered under FACA, and a parallel "incorporated alter ego" called "NCC, Inc." *Niskanen Ctr., Inc. v. U.S. Dep't of Energy*, 328 F. Supp. 3d 1, 11 (D.D.C. 2018).

51.     NCC, Inc. is an organization incorporated in Virginia, "created as a private 501(c)(6) to handle all of the business activities required to fulfill the NCC's charter." Decl. of NCC, Inc. CEO Janet Gellici at 1, *Niskanen*, ECF No. 20-1 (hereinafter "Gellici Decl.").

52.     During the Trump Administration, NCC, Inc. "collect[ed] dues" from unnamed private member organizations in order to "support NCC's efforts," *Niskanen*, 328 F. Supp. 3d at 11-12. In turn, according to the NCC's website, NCC, Inc. "provide[d] administrative assistance and support to the [NCC] on a no-cost basis to the Department of Energy."[12]

53.     When the NCC promulgated the policy recommendations described herein, Defendants utilized and relied on NCC, Inc. to undertake many of their obligations under FACA.

---

[12] *About Us*, National Coal Council, https://www.nationalcoalcouncil.org/page-About-Us.html (last visited Sept. 25, 2020).

54.     Functionally, "[t]here is no meaningful distinction" between the NCC and NCC, Inc. *Niskanen*, 328 F. Supp. 3d at 11. NCC, Inc.'s bylaws treat it as identical to the NCC, and describe "meetings of members of the Corporation" as "held to develop and consider . . . recommendations to be given to the Secretary of Energy . . . subject to and consistent with [FACA][.]"  *Id.* at 11-12 (internal quotations omitted).  *See also* NCC Articles of Restatement, Art. II (describing "purpose for which [NCC, Inc.] is formed" as "to advise, inform and make recommendations to the Secretary of Energy on general policy relating to coal[.]"); (attached as Exhibit D) *id.* Art. IV Sec. C (prescribing that "[t]he *Corporation*"— not the Council—"shall . . . give advice, information [and] recommendations to the Secretary of the Energy").

55.     Likewise, the Council's post-2017 membership is entirely coterminous with NCC, Inc. The only members of NCC, Inc. are "those individuals appointed to serve on the [Council]," *id.* Art. IV Sec. B, and NCC, Inc.'s Board of Directors (referred to as its "Executive Committee") is comprised solely of Council members.  *Id.* Art. V Sec. B.

56.     NCC, Inc. is "co-chaired" by a government employee appointed by the Secretary of Energy. *Id.* Art. VII.

57.     Although the two entities are deeply intertwined, Defendants and NCC, Inc. have recently resisted efforts that could expose the identity and

contributions of its private funders or its disbursements to Council members, arguing to a court in 2018 that "[d]isclosure of [those] records could . . . cause reputational harm to NCC, Inc. that could lead to the public discrediting of the NCC and its reports." Gellici Declaration at 2.

58.     The CEO of the two entities further admitted that the arrangement between the Council and NCC, Inc. would specifically raise serious questions under FACA, noting that disclosure of NCC, Inc.'s financial records "could lead members of the public to believe that NCC, Inc.'s operations and NCC reports are dominated by certain members," even though "FACA prohibits this practice by requiring NCC's membership to be balanced[.]" *Id.*

59.     A reasonable inference from this testimony is that NCC, Inc. is, in fact, supporting and directing the Council's work in ways inconsistent with FACA and exclusive of Plaintiff and likeminded interests, such that disclosure would more fully expose Defendants' violations of the Act: in all likelihood, the Corporation's anonymous donors are private, pro-extraction industries with a vested interested in obtaining pro-extraction recommendations from the federal advisory committee they fund.

60.     If so, then Defendants have impermissibly sought to evade FACA's requirements through a shell game: because FACA forbids the Department of Energy from overtly making policy through closed door sessions with special

interests, the Department appears to have simply cloaked that process in a parallel corporate structure. Defendants' relationship with NCC, Inc. is incompatible with FACA unless NCC, Inc. is operated entirely pursuant the Act's requirements.

## III.   The NCC's Failure to Comply with FACA's Requirements.

61.   The pro-industry tilt of the NCC and NCC, Inc. is exacerbated by the body's disregard for FACA's transparency requirements.

62.   The vast majority of the NCC's work appears to take place outside the public view.

63.   Publicly, the NCC acknowledges two types of meetings: annual meetings, twice a year, which are multi-day, in-person affairs; and virtual meetings in which proposed NCC reports are discussed and voted on.

64.   These two types of meetings appear to have little bearing on the actual preparation of recommendations for the Secretary of Energy.

65.   While the NCC holds public virtual meetings on which the Council nominally votes on the final drafts of its lengthy, detailed, and polished reports, the NCC appears to hold no meetings in which the process of developing or creating these reports are visible to the public. The NCC holds no public hearings gathering research, testimony, or evidence for its reports, nor does it seek public input until the point at which a near-final report is presented for a vote to the Council.

66.     Plainly, these reports are dependent on significant quantities of material prepared for the Council but not yet released to the public.

67.     It is plausible that this work is done by "subcommittees . . . formed by the NCC Chairperson, with DOE approval, as appropriate," as described in the NCC Charter. However, no publicly available materials exist concerning whether NCC subcommittees actually exist, who their members are, and when or whether they were approved by DOE.

68.     The GSA's FACA website states that NCC "[s]tudy groups meet as necessary."[13] The website gives no further detail concerning whether these study groups are subcommittees for the purposes of the NCC's Charter, who their members are, what their mandates are, or when or whether they were approved by DOE.

69.     Indeed, prior to September 2020, Defendants themselves did not made *any* Council material available. Instead, *NCC, Inc.* is generally the keeper and publisher of Council materials, even though nothing in FACA allows the sponsor of a federal advisory committee to outsource its recordkeeping obligations to a private Corporation.[14]

---

[13] National Coal Council Committee Detail, https://www.facadatabase.gov/FACA/apex/FACAPublicCommittee?id=a10t0000001gzp4AAA (last visited Sept. 25, 2020).
[14] *See* https://www.nationalcoalcouncil.org/index.html.

70.     Defendants have also failed to release records of NCC, Inc. during the relevant period (2017 to the present), even though the Corporation's records are—according to the Corporation's Articles of Restatement—produced solely "for . . . [the] advisory committee" it serves. 5 U.S.C. § App. 2 § 10(b); *see also* Articles of Restatement Art. IV Sec. C. Under FACA, therefore, all materials produced for NCC, Inc. during the Trump administration fell under the disclosure requirements of FACA Section 10(b).

71.     Even if NCC, Inc. records did not fall under FACA Section 10 as a matter of course, the Council's alter ego has, on information and belief, frequently disseminated particular records (including reports on NCC, Inc. budgets and finances) at Council meetings since 2017. Defendants have not made these materials public.

72.     Defendants do not regularly notice meetings of NCC, Inc. (including meetings of NCC, Inc.'s subcomponents), or open those meetings to the public.

## IV.    The NCC's Biased Policy Recommendations.

73.     The NCC's current focus on coal production at the expense of all other considerations for American energy policy is evident in the NCC's recent work product.

74.     In 2015 and 2016, the NCC released reports evaluating how the coal industry could support the capture of carbon dioxide emitted by coal operations,

how the industry could shift towards lower-emission operations, and how the industry could help create a market for captured carbon dioxide emissions.

75.     By contrast, since 2017 the NCC has focused on expanding the use of and financial support for coal, without any commensurate attempt to lower emissions.

76.     The first report issued under the current administration sought to identify measures that could be taken to "increase export opportunities for U.S. coal," in light of the fact that "domestic demand for coal has softened."[15]

77.     The report recommended a variety of policies for increasing coal extraction nationwide, including "[d]eploy[ing] advanced coal mining . . . technologies to reduce production costs," "a range of support mechanisms to induce continued mining activity," "[e]liminat[ion] [of] barriers to production of coal on Federal lands" and assessing environmental regulations "to determine their impacts on U.S. coal exports." *Id.* at 59.

78.     Another 2018 report encouraged Defendants to continue their efforts to subsidize coal fired powerplants in the name of grid resiliency, recommending that Defendants take steps to "ensure that the reliable and resilient attributes of U.S. coal generation are acknowledged and that the nation's existing coal fleet is

---

[15] Letter from Deck Slone, NCC Chair to Honorable Rick Perry, U.S. Secretary of Energy, in National Coal Council, Advancing U.S. Coal Exports: An Assessment of Opportunities to Enhance Exports of U.S. Coal (2018).

equitably compensated for the services it provides."[16] It further sought "[e]conomic and regulatory support . . . to stem the tide of [coal] plant retirements," and changes to environmental regulations combined with "[j]ust compensation" for coal operators if environmental regulations didn't allow coal plants to operate for their entire "useful life."[17]

79.    In 2019, the NCC issued a report asking the Department to accelerate U.S. manufacturing of coal-derived carbon products, chemicals, fuels, and rare earth elements in order to expand the ambit of coal "beyond conventional markets for power generation and steelmaking" in the face of "the past decades' decline in coal production and use." National Coal Council, Coal in a New Carbon Age (2019) at 14.[18]

80.    The NCC's most recent report, issued in July of 2020, included roughly *70* discrete policy recommendations, each designed to "to utilize the most abundant resources under this nation's control [i.e., coal] to supply critical energy needs."[19] The recommendations include more generous financial support to coal

---

[16] Letter from Deck Slone, NCC Chair to Honorable Rick Perry, U.S. Secretary of Energy, in National Coal Council, Power Reset: Optimizing the Existing U.S. Coal Fleet to Ensure a Reliable and Resilient Power Grid, (2018).

[17] *Id.*

[18] Plaintiff incorporates the NCC's Reports into this Complaint, and likewise incorporates the NCC's Charter.

[19] Letter from Danny Gray, NCC Chair to Honorable Dan Brouillette, U.S. Secretary of Energy in National Coal Council, Coal Power: Smart Policies in Support of Cleaner Stronger Energy (2020), https://www.nationalcoalcouncil.org/studies/2020/COAL-POWER-Cleaner-Stronger-Energy.pdf.

companies, tax breaks, and significant amendments to pollution control regimes

such as the Clean Air Act.[20] They also reiterate the NCC's misguided and

scientifically unsound focus on subsidizing coal to achieve grid "resiliency."[21]

81.     As the NCC's balance and vision has changed, its capacity to

contextualize the coal industry's interests within other public policy considerations

for the federal government—such as global climate change and public and private

land conservation—has all but evaporated: the Council's recent reports contain no

recommendations tailored to conserving or protecting the land on which coal is

extracted, or for addressing the interests of Plaintiff or similarly situated entities.

## CLAIMS FOR RELIEF

### Count One
### Failure to Open Council Meetings
### 5 U.S.C. §§ 706(1), (2), 5 U.S.C. App. 2 § 10(a)

82.     Plaintiff repeats and incorporates by reference each of the forgoing

allegations as if fully set forth herein.

83.     FACA and its implementing regulations require that Defendants be

transparent and open when conducting advisory committee business, but the NCC

has unlawfully closed its meetings. 5 U.S.C. App. 2 § 10(a)(1).

---

[20] National Coal Council, Coal Power: Smart Policies in Support of Cleaner Stronger Energy at 145-54.
[21] *Id.* at 147-53

84.     During the relevant time period (2017 to the present), Defendants have failed to open Council subcommittees to the public, even though those groups appear to be crafting the Council's policy recommendations and offering the recommendations directly to Defendants without intermediate deliberation by the full Council. Nor have Defendants properly noticed or opened meetings of NCC, Inc.

85.     The NCC's closed meetings constitute unlawful agency action, 5 U.S.C. § 706(2) and agency action unlawfully withheld, *id.* § 706(1).

**Count Two**
**Failure to Release Council Materials**
**5 U.S.C. § 706(1), 5 U.S.C. App. 2 § 10**

86.     Plaintiff repeats and incorporates by reference each of the forgoing allegations as if fully set forth herein.

87.     FACA requires that Defendants make available to the public the "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, [and] other documents . . . made available to or prepared for" the NCC and its subcommittees and working groups, 5 U.S.C. App. 2 § 10(b).

88.     Neither Defendants not NCC, Inc. have provided full records for all of the Council's meetings or those of the Council's subcommittees, the latter of which fall within FACA Section 10 because NCC subcommittees generate and

recommend policies to Defendants without intermediate deliberation by the full Council.

89.     Defendants have not released materials prepared for or by NCC, Inc. within the meaning of FACA.

90.     Defendants' failure to release NCC and NCC, Inc. records constitutes agency action unlawfully withheld, 5 U.S.C. § 706(1).

**Prayer for Relief**

91.     WHEREFORE, Plaintiff prays that this Court:

92.     order Defendants to immediately release all materials prepared for the NCC or its subcommittees—specifically all materials prepared from 2017 to the present in connection with the Council's formal reports—and to provide a *Vaughn* index for such materials and those withheld from production, in whole or in part, for any reason;

93.     order Defendants to immediately release all records prepared for or by NCC, Inc. during the time period from 2017 to the present, and to provide a *Vaughn* index for such materials and those withheld from production, in whole or in part, for any reason;

94.     through the named Defendants, enjoin the NCC from meeting, advising the Secretary, and otherwise conducting Council business until Defendants comply with FACA Section 10;

95.    if Defendants cannot or refuse to rely on NCC, Inc. consistent with FACA, enjoin Defendants from employing, using, or relying on NCC, Inc. in support of the NCC;

96.    award Plaintiff its costs, attorneys' fees, and other disbursements for this action; and

97.    grant any other relief this Court deems appropriate.

DATED: October 15, 2020.

Respectfully submitted,

*/s/ Travis Annatoyn*
Travis Annatoyn (D.C. Bar No. 1616605)
(*pro hac vice* pending)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 701-1782
tannatoyn@democracyforward.org

*/s/ Shiloh Hernandez*
Shiloh Hernandez (MT Bar. No. 9970)
Western Environmental Law Center
103 Reeder's Alley
Helena, MT 59601
(406) 204-4861
hernandez@westernlaw.org