IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS,<br><br>            Plaintiff,<br><br>vs.<br><br>DAVID G. HUIZENGA, in his official capacity as Acting Secretary of Energy, and UNITED STATES DEPARTMENT OF ENERGY,<br><br>            Defendants. | CV-20-98-GF-BMM<br><br>ORDER |

## INTRODUCTION

This Order addresses a pending Motion to Dismiss (Doc. 8) filed by the Defendants in this matter, the United States Department of Energy and Acting Energy Secretary David G. Huizenga (collectively, "DOE"). Plaintiff Western Organization of Resource Councils ("Plaintiff"), a Montana-based organization representing ranchers, landowners, and other interested parties, filed a Complaint with this Court on October 15, 2020. (Doc. 1). The Complaint alleges that DOE has violated aspects of the Federal Advisory Committee Act ("FACA") in DOE's administration of the National Coal Council (the "Council") and its subsidiaries. *See id.*

DOE filed its Motion to Dismiss (Doc. 8) on December 21, 2020, asking this Court to dismiss Plaintiff's Complaint in its entirety. (Doc. 9 at 24). DOE argues that, although the Complaint asserts two claims under FACA, an open-meetings claim and an open-records claim, Plaintiff actually seeks relief on each claim as to three distinct entities—the full Council, the Council's subcommittees, and the National Coal Council, Inc. ("NCC, Inc." or the "Corporation"). *Id.*

DOE contends that the Court lacks jurisdiction under Fed. R. Civ. P. 12(b)(1) to grant relief on either claim as to the Council itself, because Plaintiff lacks the requisite injury to establish standing. *Id.* at 25–33. Plaintiff asks the Court to disregard DOE's jurisdictional arguments, as it seeks no relief against the open meetings or available records of the full Council. (Doc. 10 at 18). The Court agrees with Plaintiff and will disregard those jurisdictional arguments asserted by DOE. DOE separately asserts that the Court should dismiss Plaintiff's claims against the Council's subcommittees and NCC, Inc. for failure to state a justiciable claim under Fed. R. Civ. P. 12(b)(6). (Doc. 9 at 33–42).

## LEGAL BACKGROUND

Congress enacted FACA in 1972 with recognition that "many committees, boards, commissions, and other groups provide the executive branch with valuable expert advice, ideas and opinions." *People for Ethical Treatment of Animals v. Barshefsky*, 925 F. Supp. 844, 847 (D.D.C. 1996) (citing 5 U.S.C. app. 2 § 2(a)).

Two principle purposes underlie the statute: "to enhance the public accountability of advisory committees established by the Executive Branch and to reduce wasteful expenditures on them." *Id.* (quoting *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 459 (1989)). In passing FACA, Congress recognized the need for balance between the advisory committees' furnishing of useful expert advice, ideas, and diverse opinions, and the proliferation of costly committees dominated by industry and special interests seeking to advance their own agendas. *W. Org. of Res. Councils v. Bernhardt*, 362 F. Supp. 3d 900, 905 (D. Mont. 2019) (hereinafter, "*Bernhardt I*") (quoting *Cummock v. Gore*, 180 F.3d 282, 284 (D.C. Cir. 1999)).

FACA defines an advisory committee as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . which is . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government." 5 U.S.C. app. 2 § 3(2). To constitute a committee under FACA, the President or an executive agency must establish or utilize the entity for advice or recommendations. *See Barshefsky*, 925 F. Supp. at 847.

An advisory committee under the terms of FACA must comply with detailed transparency requirements. *Id.* (citing 5 U.S.C. app. 2 §§ 9–10). Those requirements include an obligation to hold each committee meeting open to the

3

public, after having provided advance notice of each meeting by publication in the Federal Register. 5 U.S.C. app. 2 § 10(a)(1)–(2). Subject only to exceptions under the Freedom of Information Act, committees also must make accessible for public inspection the "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee." *Id.* § 10(b). An advisory committee's membership must be "fairly balanced in terms of the points of view represented and the functions to be performed." *Id.* § 5(b)(2). A committee's advice must reflect its "independent judgment" without inappropriate influences from the appointing authority or special interests. *Id.* § 5(b)(3).

## FACTUAL BACKGROUND

*The National Coal Council and Subcommittees*

DOE chartered the Council as a federal advisory committee charged with generating coal-related policy and advice recommendations for the Secretary of Energy. (Doc. 9-1 at 2). DOE first established the Council in 1984 and has since renewed the Council's federal charter several times, most recently in November 2019. (Doc. 9 at 15). The Council's mandate states that it advises DOE on "[f]ederal policy that affects, directly or indirectly, the production, marketing[,] and use of coal," as well as "the technological, regulatory[,] and social impact of issues relating to coal production and use." (Doc. 9-1 at 2). The Council consists of

110 members, all appointed by the Secretary for terms of up to two years. (Doc. 9 at 16).

The Council typically meets twice annually "to deliberate, discuss, and vote on reports and recommendations to be made to the Secretary." *Id.* The Council produces lengthy reports that include numerous policy recommendations routinely advocating for increased coal production and consumption. *See, e.g.*, Advancing U.S. Coal Exports: An Assessment of Opportunities to Enhance Exports of U.S. Coal, National Coal Council Report (2018) (hereinafter, "2018 NCC Coal Exports Report"). Although Council reports are "finalized" in public Council meetings, Plaintiff alleges that Council subcommittees and NCC, Inc. conduct the research for the reports, compose the substance of the reports, and draft and revise the Council's reports. (Doc. 10 at 14).

The Council's charter contemplates the Council's use of subcommittees, characterized by DOE as "'study groups' of manageable size formed to develop reports and recommendations for the full Council to consider." (Doc. 9 at 10). References throughout this Order to the Council's "subcommittees" incorporate all working groups, study groups, or any other similarly situated sub-organization formed under the Council's charter. DOE must approve the formation of Council subcommittees, and the subcommittees' membership also remains subject to DOE approval. (Doc. 9-1 at 3). Subcommittees may be made up of Council members or

5

"[a]d hoc members from outside the [Council]" who may be appointed by the Council's chairperson and DOE "to ensure the competence necessary to conduct the subcommittee's business." *Id.* The Council's subcommittees do not disclose their meetings, meeting minutes, records, or membership to the public. *See* Doc. 9 at 10.

*National Coal Council, Inc.*

NCC, Inc., a private 501(c)(6) organization incorporated in Virginia, serves as an "umbrella organization" to the Council. 2018 NCC Coal Exports Report, at Overview. An "umbrella organization" means "an organization that controls or organizes the activities of several other organizations, all of which have a similar purpose." *Umbrella organization*, *Cambridge Dictionary*, https://dictionary.cambridge.org/us/dictionary/english/umbrella-organization (last accessed Apr. 6, 2021). NCC, Inc. "manages the business aspects of running the Council." 2018 NCC Coal Exports Report, at Overview. Another court has referred to NCC, Inc. as the Council's "incorporated alter ego." *See Niskanen Ctr., Inc. v. U.S. Dep't of Energy*, 328 F. Supp. 3d 1, 11 (D.D.C. 2018). NCC, Inc. and the Council share the same established purpose. *See* Doc. 9-1 at 2; Doc. 1-5 at 8. Its Articles of Incorporation provide that NCC, Inc. was formed as an unnamed private member organization "to advise, inform and make recommendations to the Secretary of

Energy with respect to matters submitted to the Corporation by the Secretary of Energy." (Doc. 1-5 at 8).

NCC, Inc.'s membership exists "entirely coterminous" with that of the Council. (Doc. 1 at 17). NCC, Inc.'s membership consists of "those individuals appointed to serve on the [Council] by the Secretary of Energy." (Doc. 1-5 at 9). The Secretary of Energy may terminate membership in NCC, Inc. "without cause at any time." *Id.* NCC, Inc.'s "Executive Committee" acts as its board of directors. *Id.* at 10. Executive Committee membership also consists solely of Council members. (Doc. 1 at 17). The Secretary of Energy appoints a "Government Co-Chairman" to NCC, Inc. with significant stated powers related to meetings and conduct of NCC, Inc. (Doc. 1-5 at 13). This "Government Co-Chairman" appointee "and his [or her] delegates shall be full-time employees of the Federal Government," but cannot serve as an officer of NCC, Inc. *Id.* NCC, Inc. shares the same CEO as the Council, and the same officers. *Niskanen*, 328 F. Supp. 3d at 11–12; Doc. 1 at 18.

NCC, Inc. receives no government funding to support its operation. (Doc. 9 at 41). NCC, Inc. relies instead upon annual voluntary contributions from members and sponsors. *Id.* NCC, Inc., in turn, "provide[s] administrative assistance and support to the [Council] on a no-cost basis to the Department of Energy." (Doc. 1 at 16).

## LEGAL STANDARD

A motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure challenges the legal sufficiency of a plaintiff's pleadings. *Bernhardt I*, 362 F. Supp. 3d at 907. The complaint must allege "enough facts to state a claim to relief that is plausible on its face" to survive a Rule 12(b)(6) motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 8(a). The "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Bernhardt I*, 362 F. Supp. 3d at 907 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). A court must accept as true all well pleaded facts in the complaint when reviewing a Rule 12(b)(6) motion. *Id.* Rule 12(b)(6) does not require a court to accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Id.* (quoting *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)).

## DISCUSSION

Plaintiff drafted its Complaint to assert the following two claims: an open-meetings claim under § 10(a) of FACA; and an open-records claim under § 10(b). (Doc. 1). DOE, in its Motion to Dismiss (Doc. 8), insists that Plaintiff actually seeks relief on each claim as to three distinct entities—the full Council, the Council's subcommittees, and NCC, Inc.—each of which DOE alleges receive

different treatment in a FACA determination. (Doc. 9 at 24). The Court already has determined to disregard DOE's arguments for dismissal of Plaintiff's claims against the full Council under Fed. R. Civ. P. 12(b)(1). Regarding Plaintiff's claims against the Council's subcommittees and NCC, Inc., DOE contends that Plaintiff has failed to state a claim upon which relief may be granted. *Id.* at 33–42 (citing Fed. R. Civ. P. 12(b)(6)). The Court now turns to DOE's arguments that Plaintiff has failed to state a claim as to the Council's subcommittees and NCC, Inc.

I. **Whether Plaintiff has stated a claim for relief regarding NCC, Inc.**

DOE asserts that Plaintiff has failed to state a claim regarding the accessibility of NCC, Inc.'s records and meetings. (Doc. 9 at 37). DOE contends that "the relief Plaintiff seeks is not required by FACA or supported by the allegations in the complaint." *Id.* Plaintiff argues that DOE must release NCC, Inc. records because DOE and other federal agencies "utilize" NCC, Inc. (Doc. 10 at 9). Plaintiff contends that DOE's utilization of NCC, Inc. renders it a federal advisory committee within the meaning of FACA. *Id.* Plaintiff alternatively asserts that records of NCC, Inc. necessarily represent those of the Council. (Doc. 10 at 24–25). Plaintiff argues that those records are "made available to or prepared for" the Council and, therefore, that the records remain subject to FACA disclosure requirements under 5 U.S.C. app. 2 § 10(b). *Id*. Plaintiff insists that it adequately has pleaded existence of NCC, Inc. documents that meet the "made available to or

prepared for" definition. *Id.* at 25. The Court need not reach Plaintiff's alternative argument, as the Court concludes that Plaintiff has met the plausibility pleading standard in alleging that NCC, Inc. operates as a federal advisory committee under FACA.

To constitute a federal advisory committee under FACA, the President or an executive agency must establish or utilize the entity for advice or recommendations. *See Barshefsky*, 925 F. Supp. at 847. The parties agree that neither the President, nor DOE, "established" NCC, Inc., as contemplated in FACA. The parties disagree as to whether DOE "utilizes" NCC, Inc. for advice or recommendations. 5 U.S.C. app. 2 § 3(2).

Regulations implementing FACA provide that "utilize" as used in the statute "does not have its ordinary meaning." 41 C.F.R. § 102-3.25. The regulations contemplate, instead, that a committee would be "utilized" within the meaning of the FACA where "the President or a Federal office or agency exercises *actual management or control* over its operation." 41 C.F.R. § 102-3.25 (emphasis added). "The operative criterion for determining whether a committee has sufficiently close ties to an agency in order to render it 'utilized' is whether the agency has either *management* of the committee or exerts some other type of *control*, but not necessarily both." Federal Advisory Committee Management, 66 Fed. Reg. 37,728, at 37,729 (July 1, 2001) (emphasis in original). The Ninth

Circuit has determined that the term "utilized" "encompasses a group organized by a nongovernmental entity," but that nonetheless remains so "'closely tied' to an agency as to be amenable to 'strict management by agency officials.'" *Aluminum Co. of Am. v. Nat'l Marine Fisheries Serv.*, 92 F.3d 902, 905 (9th Cir. 1996) (quoting *Food Chem. News v. Young*, 900 F.2d 328, 332–33 (D.C. Cir. 1990)).

Plaintiff contends that it has alleged sufficient facts showing that NCC, Inc. stands more than merely "amenable" to DOE's management or control. (Doc. 10 at 20). Plaintiff alleges that NCC, Inc. depends upon the Secretary of Energy for its very existence. *Id.* Plaintiff cites NCC, Inc.'s own Articles of Incorporation as evidence of NCC, Inc.'s amenability to strict management or control by the Secretary of Energy. *Id.* at 20–21. As discussed above, a "Government Co-Chairman," appointed by the Secretary of Energy, maintains authority over any NCC, Inc. meeting falling under FACA requirements, and all related work. *Id.* (citing Doc. 1-5 at 13). The Secretary necessarily appoints NCC, Inc.'s membership based on the Secretary's appointment of the Council's membership. *Id.* Plaintiff alleges that this appointment power gives the Secretary control over "who is eligible to serve as and vote for the Corporation's Executive Committee." *Id.* at 21. The Secretary may revoke membership in NCC, Inc. at any time, without cause. (Doc. 1-5 at 9). Plaintiff contends that this removal power "permit[s] the

Secretary to govern the Corporation by choosing likeminded Council members and dismissing those who are uncooperative." (Doc. 10 at 21).

Despite this evidence of potential federal agency control as stated in the Complaint, DOE insists upon the Complaint's insufficiency as it relates to NCC, Inc. (Doc. 9 at 41–42). DOE downplays the level of control that the Secretary may exercise over NCC, Inc.'s activities, and relies upon NCC, Inc.'s organization as a "private" entity, that receives private funding, as evidence of NCC, Inc.'s separation from DOE's oversight. *Id.* at 40. DOE contends that Plaintiff's Complaint (Doc. 1) and its responsive briefing (Doc. 10) "demonstrate[] only *potential* agency influence over NCC, Inc., not actual control." (Doc. 18 at 10). DOE reads controlling authority as requiring Plaintiffs to "allege facts showing that [DOE] exercises something approaching actual—not potential—control of NCC, Inc." *Id.* DOE cites several decisions as support for its argument that "an alleged advisory committee is only 'amenable to strict management by agency officials' if it is shown to be subject to the actual management and control of a federal agency." *Id.* at 9 (citing *Town of Marshfield v. FAA*, 552 F.3d 1, 6 (1st Cir. 2008); *Byrd v. EPA*, 174 F.3d 239, 246 (D.C. Cir. 1999); *Miccosukee Tribe of Indians of Fla. v. United States*, 420 F. Supp. 2d 1324, 1342 (S.D. Fla. 2006)). The courts decided the majority of these cases, however, on motions for summary judgment, or at some other procedural stage in the proceedings.

Courts "typically and appropriately" should resolve FACA claims on motions for summary judgment. *Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*, 369 F. Supp. 3d 27, 48 (D.C. Cir. 2019) (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). To resolve FACA claims at the summary judgment phase of proceedings permits a court to "identify what documents have been withheld and why." *Id.* This conclusion largely coincides with DOE's stated authority. For example, *Byrd* concerned the District of Columbia Circuit's review of a federal district court's grant of summary judgment in favor of the government. 174 F.3d 239. *Miccosukee Tribe* also involved a summary judgment determination made by the District Court. 420 F. Supp. 2d 1324. The parties in those cases had the opportunity to develop the factual record as these decisions address motions for summary judgment. None of the cited cases involved a motion to dismiss under Rule 12(b)(6). These decisions tend to support a ruling that permits a plaintiff to proceed past the pleadings stage to develop the factual record. *See Drone Advisory Comm.*, 369 F. Supp. 3d at 48.

The Court agrees that Plaintiff's Complaint contains limited references to specific instances of noncompliance with FACA § 10. The Court notes, however, that Plaintiff's Complaint alleges that Plaintiff sought disclosure of records and meetings of NCC, Inc. from DOE. (Doc. 1 at 6–8). DOE later denied this request. *Id.*; *see also Drone Advisory Comm.*, 369 F. Supp. 3d at 48. The Court hardly can

expect Plaintiff, at this stage of the proceedings, to identify specific instances of DOE's noncompliance with FACA, or to name specific examples of DOE's exercise of actual management or control of NCC, Inc.'s activities. This conclusion proves particularly true where DOE refuses to provide records that either may substantiate or undermine Plaintiff's claims with respect to evidence of specific instances of FACA noncompliance.

The Court's role in deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6) requires a plausibility determination on the facts as alleged in Plaintiff's Complaint. *Bernhardt I*, 362 F. Supp. 3d at 907. Despite DOE's insistence to the contrary, Plaintiff has pleaded sufficient facts to plausibly claim that DOE does not maintain a passive role in NCC, Inc.'s operation. Taking those facts as true, the Court concludes that Plaintiff has met its pleading obligation in this instance, by alleging that a particular legal relationship or pattern of conduct points to the likelihood of improper withholdings under FACA. (Doc. 10 at 34 (citing *Drone Advisory Comm.*, 369 F. Supp. 3d at 48–49)). The Court denies DOE's Motion to Dismiss (Doc. 8) as it pertains to NCC, Inc.

## II.  Whether Plaintiff has stated a claim for relief regarding the Council's subcommittees.

The Court next must determine whether Plaintiff has pleaded sufficient facts alleging that the Council's subcommittees are subject to the transparency requirements of FACA § 10. DOE maintains that the allegations in Plaintiff's

Complaint do not establish Plaintiff's legal entitlement to access the meetings and records of Council subcommittees. (Doc. 9 at 33). Plaintiff counters that it has alleged sufficient facts to show that the Council merely "rubber stamps" the recommendations of its subcommittees. (Doc. 10 at 31). Plaintiff insists that it has exceeded the pleading standard applied to cases where the government is alleged to have unlawfully withheld documents. *Id.* at 32.

Regulations implementing FACA exempt "subcommittees of advisory committees" from FACA's requirements where those subcommittees "report to a parent advisory committee and not directly to a Federal officer or agency." 41 C.F.R. § 102-3.35(a). The subcommittee exemption does not apply where the subcommittee "makes recommendations directly to a Federal officer or agency, or if [the subcommittee's] recommendations will be adopted by the parent advisory committee without further deliberations by the parent advisory committee." 41 C.F.R. 102-3.145. In such instances, the subcommittee must conduct its meetings "in accordance with all openness requirements." 41 C.F.R. 102-3.145.

DOE argues in support of its Motion to Dismiss (Doc. 8) that Plaintiff's Complaint fails to allege "any specific instance . . . where a recommendation was adopted without further deliberation by the full Council." (Doc. 9 at 36). DOE insists that Plaintiff draws "unwarranted inferences" in an effort to shore up its claims. *Id.* Plaintiff counters that it has "done one better" than identify a single

instance of the Council's FACA noncompliance, by alleging that *all* subcommittee recommendations since 2017 were rubber stamped by the Council without further deliberation. (Doc. 10 at 32).

Plaintiff alleges that the full Council operates as a "rubber stamp" for its subcommittees' reports because the Council merely votes to "finalize" the reports, and "does not discuss, deliberate, or question the voluminous and detailed reports presented to it at its full meetings." *Id.* at 31. Plaintiff asserts that the Council's meeting minutes do not reflect a "single vote to disapprove of Council reports in the last three years." *Id.* According to Plaintiff, Council meeting minutes further indicate that no Council member has asked a single substantive question regarding the draft reports since 2017. *Id.* at 14. Plaintiff contends that these Council reports depend on significant research, drafting, and revision, "all of which occurs entirely in private, unpublicized meetings and on the basis of non-public records." (Doc. 10 at 14; Doc. 1 at 19–20). Plaintiff alleges that the Council adopts wholesale these substantive recommendations provided by its subcommittees. (Doc. 10 at 31).

Decisions by district courts in *Electronic Privacy Information Center v. Drone Advisory Committee,* 369 F. Supp. 3d 27 (D.D.C. 2019), and *Western Organization of Resource Councils v. Bernhardt*, 412 F. Supp. 3d 1227 (D. Mont. 2019) (hereinafter, "*Bernhardt II*"), prove helpful in the Court's analysis. In *Drone Advisory Committee*, the subcommittee in question made substantive

16

recommendations that "were not simply rubber-stamped and accepted wholesale" by the parent advisory committee. 369 F. Supp. 3d at 46. Unlike the present case, the meeting minutes of the parent advisory committee in *Drone Advisory Committee* revealed that the subcommittee recommendations "were discussed and sometimes amended prior to final approval and forwarding" to the federal agency. *Id.* These actions placed the subcommittee outside FACA's transparency requirements. *Id.* Plaintiff alleges, by contrast, that the Council's meeting minutes show no such similar discussion and amendments to reports prior to finalization. (Doc. 10 at 31).

*Bernhardt II* involved a question of whether a parent advisory committee's subgroups fell under FACA § 10 because, as the plaintiff there argued, the full committee had "fail[ed] to respond to public comment following the presentation of certain [subgroup] recommendations." 412 F. Supp. 3d at 1241. The deciding question ultimately centered around whether the parent advisory committee had engaged in "further deliberations" of the different subgroups' recommendations. *Id.* (quoting 41 C.F.R. § 102-3.145). The district court rejected the plaintiff's argument. The court declined to review recommendations made by different subgroups individually "to determine on a case-by-case basis whether a nebulous level of 'deliberation' occurred." *Id.* Here, unlike the subgroup recommendations in *Bernhardt II*, Plaintiff does not point to individual instances of rubber-stamping

17

to support its claim. Plaintiff instead alleges that the Council rubber-stamps *all* recommendations made by its subcommittees—an allegation that distinguishes this case from the disfavored "case-by-case" determinations as discussed in *Bernhardt II*. (Doc. 10 at 32).

Plaintiff has met its burden of establishing the facial plausibility of its FACA claims as it pertains to the Council's subcommittees by way of sufficient factual allegations in its Complaint. From the lack of documentation of any substantive discussion, revision, or amendment of the Council's reports in the Council's meeting minutes, Plaintiff draws a plausible inference that the development of these reports occurs largely behind closed doors in meetings of Council subcommittees. Plaintiff suggests that the Council attempts minimum FACA compliance by surfacing its reports for "finalization" only after the Council's subcommittees have performed the substantive work of composing the reports in their entirety. The Court accepts as true at this stage of the proceedings Plaintiff's factual allegations and the reasonable inferences drawn from those allegations. *Bernhardt I*, 362 F. Supp. 3d at 907.

Accordingly, **IT IS ORDERED** that DOE's Motion to Dismiss (Doc. 8) is **DENIED**.

Dated this 6th day of April, 2021.

Brian Morris, Chief District Judge
United States District Court