Shiloh Hernandez (MT Bar No. 9970)
Senior Attorney
Earthjustice
Northern Rockies Office
313 East Main Street
P.O. Box 4743
Bozeman, MT 59772-4743
T: (406) 586-9692 ext. 1929
shernandez@earthjustice.org

Aman George (D.C. Bar No. 1028446)
(admitted *pro hac vice*)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
T: (202) 701-1783
ageorge@democracyforward.org

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| WESTERN ORGANIZATION OF RESOURCE COUNCILS, <br><br> *Plaintiff*, <br><br> vs. <br><br> JENNIFER GRANHOLM, et al., <br><br> *Defendants*. | Case No. 4:20-cv-98-BMM <br><br><br> **PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGEMENT** |

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................1

BACKGROUND ................................................................2

   I.     The Federal Advisory Committee Act..................................2

   II.    The National Coal Council ..........................................4

      A.   The National Coal Council, Inc. ...................................6

      B.   The Council's Subcommittees ....................................10

   III.   WORC's Request....................................................11

   STANDARD OF REVIEW .........................................................13

   ARGUMENT.....................................................................13

   I.     The Corporation Should Be Subject to FACA .....................13

      A.   The Corporation's Governing Documents Show It Is Amenable to Strict Management By the Department ...................................16

          1.   The Secretary Appoints and Dismisses Every Member Of the Corporation ..........................................................16

          2.   The Secretary Controls the Corporation's Agenda ........................19

          3.   The Corporation's Work Is Virtually Identical to the Council's Work Under FACA ................................................20

      B.   Corporation Records Are Inherently Council Records, and Therefore Subject to FACA........................................................23

          1.   The CEO Of the Corporation Plays a Significant Role In the Council's Work......................................................24

          2.   Council Meetings Moved Seamlessly Between Council and Corporation Business...............................................25

   II.    The Council's Subcommittees Should Be Subject to FACA ..............26

   CONCLUSION..................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aluminum Co. of Am. V. Nat'l Marine Fisheries Serv.*,
   92 F.3d 902 (9th Cir. 1996) ............................................................14, 18

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
   997 F.2d 898 (D.C.Cir.1993) ...............................................................14

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ..............................................................................17

*Byrd v. U.S. Env't. Protection Agency*,
   174 F.3d 239 (D.C. Cir. 1999) ........................................................15, 17

*City & Cty. of San Francisco v. United States*,
   130 F.3d 873 (9th Cir. 1997) ................................................................13

*Clackamas Gastroenterology Assocs., P.C. v. Wells*,
   538 U.S. 440 (2003) ..............................................................................17

*Clouser v. Espy*,
   42 F.3d 1522 (9th Cir. 1994) ................................................................13

*Ctr. for Biological Diversity v. Tidwell*,
   239 F. Supp. 3d 213 (D.D.C. 2017) .................................................13, 23

*Cummock v. Gore*,
   180 F.3d 282 (D.C. Cir. 1999) ................................................................3

*Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*,
   369 F. Supp. 3d 27 (D.D.C. 2019) .........................................................27

*Food Chemical News v. Young*,
   900 F.2d 328 (D.C. Cir. 1990) ..............................................................15

*Heartwood, Inc. v. U.S. Forest Serv.*,
   431 F. Supp. 2d 28 (D.D.C. 2006) .........................................................27

*Kaplan v. Block*,
   183 Va. 327 (1944) ................................................................................19

*Lawyers' Comm. for Civ. Rts. Under Law v. Presidential Advisory Comm'n on Election Integrity*,
316 F. Supp. 3d 230 (D.D.C. 2018).....................................................23

*Niskanen Ctr., Inc. v. U.S. Dep't of Energy*,
328 F. Supp. 3d 1 (D.D.C 2018)..........................................................24

*Occidental Eng'g Co. v. I.N.S.*,
753 F.2d 766 (9th Cir. 1985) .................................................................2

*People for Ethical Treatment of Animals v. Barshefsky*,
925 F. Supp. 844 (D.D.C. 1996)............................................................2

*Pub. Citizen v. U.S. Dep't of Just.*,
491 U.S. 440 (1989)............................................................3, 12, 13

*Rochez Bros., Inc. v. Rhoades*,
527 F.2d 880 (3d Cir. 1975) ................................................................18

*VoteVets Action Fund v. U.S. Dep't of Veterans Affairs*,
992 F.3d 1097 (D.C. Cir. 2021)...........................................................14

*Wash. Legal Found. v. U.S. Sentencing Comm'n*,
17 F.3d 1446 (D.C. Cir. 1994)........................................................15, 20

*Wash. Toxics Coal. v. U.S. Env't. Protection Agency*,
357 F. Supp. 2d 1266 (W. D. Wash. 2004) ........................................15

*Washington Legal Found. v. Am. Bar Ass'n*,
648 F. Supp. 1353 (D.D.C. 1986).........................................................3

*WORC v. Bernhardt*,
412 F. Supp. 3d 1227 (D. Mont. 2019)...............................................28

**Statutes**

5 U.S.C. App. II (FACA)

§ 2(B) .....................................................................................................2

§ 2............................................................................................................13

§ 5(b)(2) ..................................................................................................3

§ 10(a)(2) ..........................................................................................................3

§ 10(a)(3) ..........................................................................................................3

§ 10(b)................................................................................................4, 16, 23

5 U.S.C. §§ 701-704 ........................................................................................13

5 U.S.C. §§ 706 ................................................................................................13

## Regulations

17 C.F.R. § 230.405 .........................................................................................18

41 C.F.R. § 102-3.140(a), (d)............................................................................3

41 C.F.R. § 102-3.145 ................................................................................4, 27

66 Fed. Reg. 37,728 (July 19, 2001)..........................................................4, 26

## Other Authorities

18 C.J.S *Corporations* § 48 (2021)..................................................................20

19 C.J.S *Corporations* § 640 (2021)................................................................20

*Black's Law Dictionary* (11th Ed. 2019) ........................................................18

Restatement (Second) of Agency § 213 (1958)...............................................17

## INTRODUCTION

The Department of Energy receives policy advice and recommendations from the National Coal Council ("the Council"), an advisory committee that the Department chartered under the Federal Advisory Committee Act ("FACA"). Between 2017 and 2020, while aggressively supporting a pro-coal agenda at the Department, the Council undertook much of its work out of the public eye, contrary to both the letter and spirit of FACA.

Rather than allow public access to the Council's work, the Council relied on other entities, ostensibly outside FACA's reach, to fulfill its mission. The first is a private trade association, the National Coal Council, Inc. ("the Corporation"), funded by coal industry interests, that used the government's imprimatur to undertake its work, lend credibility to its recommendations, and fundraise for itself, while shielding itself from FACA's transparency requirements by papering a legal separation from the Council.

The second were the Council's subcommittees, whose members the Corporation recommended to the Department, and which spent years crafting pro-coal recommendations that sprung fully formed before the Council, receiving no discussion or debate before approval and transmittal to the Department.

These arrangements between the Council, Corporation, and subcommittees violated the core of FACA's guarantees of procedural regularity and transparency.

1

The Council was an opaque channel for official policy advice between the coal industry and the Department, to the detriment of any person that may be harmed by the extraction, processing, or combustion of coal.

This Court should open the Council's work to the public by granting summary judgment to Plaintiff and requiring the Corporation and the Council's subcommittees to disclose the documents Plaintiff requested concerning their work between 2017 and 2020.

## BACKGROUND[1]

### I.     The Federal Advisory Committee Act

"The Federal Advisory Committee Act . . . was enacted in 1976 with Congress' recognition that many committees, boards, commissions, and other groups provide the executive branch with valuable expert advice, ideas and opinions."[2] *People for Ethical Treatment of Animals v. Barshefsky*, 925 F. Supp. 844, 847 (D.D.C. 1996). "However, Congress was also cognizant of the fact that

---

[1] While Local Rule 56.1(a)-(b) contemplates statements of disputed and undisputed facts, the parties agree that is unnecessary here, where the Court can resolve this case based on the administrative record alone. *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).

[2] FACA defines an "advisory committee" as "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . which is established or utilized by one or more agencies in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government . . . ." 5 U.S.C. App. II § 2(B).

many advisory committees were created without adequate justification," *id.*, and "Congress [] feared the proliferation of costly committees . . . dominated by representatives of industry and other special interests seeking to advance their own agendas." *Cummock v. Gore,* 180 F.3d 282, 284 (D.C. Cir. 1999). FACA was designed to arrest these trends and "cure . . . the wasteful expenditure of public funds for worthless committee meetings and biased proposals." *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 453 (1989).

As relevant to this case, FACA "aims to control the advisory committee process" by "open[ing] to public scrutiny the manner in which government agencies obtain advice from private individuals and groups." *Washington Legal Found. v. Am. Bar Ass'n,* 648 F. Supp. 1353, 1358 (D.D.C. 1986) (quotation omitted). Thus, FACA requires committees to be "fairly balanced in terms of the points of view represented," in their memberships, 5 U.S.C. App. II ("FACA") § 5(b)(2), provide "timely notice" of its meetings to the public, FACA § 10(a)(2), and allow interested persons to "attend, appear before, or file statements with [the] committee," *id.* § 10(a)(3). All meetings must be held "in a manner or place reasonably accessible to the public" and permit "[a]ny member of the public [to] speak to or otherwise address the advisory committee if the agency's guidelines so permit." 41 C.F.R. § 102-3.140(a), (d) (1999). Finally, every advisory committee must publicize "the records, reports, transcripts, minutes, appendixes, working

3

papers, drafts, studies, agenda, [and] other documents . . . made available to or prepared for" the committee. FACA § 10(b).

These requirements apply with full force to an advisory committee's subcommittees when "a subcommittee makes recommendations directly to a Federal officer or agency, or if its recommendations will be adopted by the parent advisory committee without further deliberations by the parent advisory committee." 41 C.F.R. § 102-3.145. Thus, the General Services Administration ("GSA") warns, "it is not permissible for parent advisory committees simply to 'rubber-stamp' the advice or recommendations of their subcommittees, thereby depriving the public of its opportunity to know about, and participate contemporaneously in, an advisory committee's deliberations." Federal Advisory Committee Management, 66 Fed. Reg. 37,728, 37,729 (July 19, 2001).

## II.    The National Coal Council

The Department of Energy ("Department") oversees, controls, and influences a number of areas of federal policy that shape development of domestic coal resources, including issuing competitive awards affecting coal extraction and production, participating in proceedings before the Federal Energy Regulatory Commission ("FERC") that can result in subsidies of coal use and production, proposing FERC regulations (such as requesting that FERC require electricity markets to subsize coal plants), or potentially using emergency authority to require

4

the use of coal in electricity generation. *See* Doc 1. ¶¶ 41–47.

In the process of crafting policy affecting coal production and consumption since 2017, the Department regularly received advice from the National Coal Council. The Council is a federal advisory committee subject to FACA whose mandate is to "provide[] advice and recommendations to the Secretary of Energy on general policy matters relating to coal and the coal industry." Doc. 35-2, AR_000001. During the period at issue in this case, the Council typically held two public meetings per year, in which it heard internal Council updates and speakers relevant to the coal industry and voted to approve four Council reports. *See* Doc. 35-2, AR_000036, 108, 121–22, 385, 399–400, 652, 667–68, 996–97; Doc. 35-3, AR_001287–88 (meeting agendas); Doc. 35-3, AR_001516, 2138, 2595; Doc. 35-4, AR_003049 (reports).

The Council has over 100 members, the vast majority of whom are employees of companies or industry groups in the business of mining, processing, or transporting coal. *See* Doc. 31-5, ¶ 9; Doc. 35-2, AR_000012–34. This tilt towards industry interests is written into the Council's membership balance plan, which requires "well balanced representation from all segments of the coal industry," but does not contemplate or require including any interests outside the coal industry. Doc. 35-2, AR_000006.

The coal industry-tilt was apparent in the Council's work between 2017 and 2020. Each of the four reports issued during the period at issue in this case advocated for using federal policy to expand U.S. coal production and/or consumption. *See* Doc. 1, ¶¶ 73–81. Council meetings were filled with pro-industry speakers, such as a speaker advising the Council that "the time for cooperation and placating the environmental left is over . . . No concessions to the environmental lobby are in your best interest." Doc. 35-2, AR_000796–97. Another speaker led the Council in a chant spelling out C-O-A-L. *Id.*, AR_001110. The chair of the Council's Coal Policy Committee (later the Council's Chairman) described "the single most important priority for the committee" as "initiatives to preserve and rejuvenate the existing coal fleet." Doc. 35-3, AR_001494.

A.    The National Coal Council, Inc.

Two other types of entities assist the Council in its work. The first is the National Coal Council, Inc. ("the Corporation"), a privately funded trade association incorporated in Virginia whose membership is at all times identical to the membership of the Council. Any member appointed to the Council is automatically elevated to membership in the Corporation, and any member dismissed from the Council is automatically terminated from membership in the Corporation. *See*, Corporation's 2017 Amended and Restated Articles of Incorporation ("Articles of Incorporation"), Doc. 1-5, Art. IV.B; s*ee also* Doc. 35-

6

2, AR_000136 (the Council and Corporation's joint Antitrust Guidelines explain that every member of the Council appointed by the Secretary of Energy is, "by virtue of that appointment . . . automatically a shareholder in [the Corporation]").

The Corporation's explicit purpose is "to advise, inform and make recommendations to the Secretary of Energy with respect to matters submitted to the Corporation by the Secretary of Energy on general policy relating to coal." Articles of Incorporation, Art. II. To fulfill that purpose, the Corporation may "give advice, information or recommendations to the Secretary of Energy . . . in a report adopted by the Corporation at a meeting of its members held in compliance with [FACA]" as well as the Articles and NCC, Inc.'s Bylaws. Articles of Incorporation, Art. IV(c).

The Corporation and the Council are subject to one joint set of antitrust guidelines, which state that "[a] written agenda for all NCC and NCC, Inc. meetings will be prepared by NCC staff," and that "[a]ll NCC and NCC, Inc. meetings will be conducted in accordance with FACA." Doc. 35-2, AR_000136.

Council meetings regularly intersperse Corporation and Council business, without acknowledgement or explanation. Twice in 2017, Council members received presentations from individuals identified as the "NCC's Finance Committee Chair" (presumably, an officer of the Corporation rather than the Council) in which members received updates on the state of the Corporation's

7

finances, noting the Corporation's expectation that appointment of new members to the Council would expand the Corporation's revenue. *See*, *e.g.*, Doc. 35-2, AR_001266–67; Doc. 35-3, AR_001488–89. In April 2017, Council members heard that the Corporation was "projecting a positive return for 2017 . . . based on reducing expenses, closely monitoring our costs, as well as increasing our membership. Membership now stands at over 140 members, and an increasing number are now paying members of the National Coal Council." Doc. 35-3, AR_001488–89. Later that year, Council members were informed that the Corporations "[e]xpenses are down five percent," and that "we have new members that have been approved. That's going to be very helpful, and we believe we'll have more revenue come in by the end of the year." Doc. 35-2, AR_001266–67.

The speakers above were not identified as representatives of the Corporation, nor were their remarks introduced as a pause in Council business to address Corporation business. Their remarks were immediately preceded and followed by Council business—such as the preparation of work groups to prepare a Council report, a technical presentation concerning carbon capture and storage, and discussion of recommendations the Council would prepare for the Secretary. *See* Doc. 35-2, AR_001265–66, 1268–72; Doc. 35-3, AR_001459–86, 1490–95. The record contains no indication that anybody leading or attending Council meetings attempted to create, or understood there to be, any meaningful division between

8

meeting time being devoted to Council versus Corporation business.

The Corporation's CEO, Janet Gellici, is an employee of the Corporation, but not a member of the Council. However, she is omnipresent in the Council's work. On two occasions, Ms. Gellici served as a Chapter Lead on Council reports; she also served as Executive Editor of two reports, and Principal Editor of another, Doc. 35-3, AR_001517–18, 2140, 2764. And she served as the primary presenter of two of the four reports to the full Council for the Council's approval. Doc. 35-2, AR_000111 (2020 *Coal Power* report presentation); AR_000654–55 (2018 *Power Reset* report presentation).[3]

Ms. Gellici's name appears over 300 times in the administrative record, more than twice as often as any other individual, including those who served as the Council's President, Vice-President, or Designated Federal Officers. Throughout the record, she is identified as "NCC CEO" (rather than CEO of NCC, Inc., the

---

[3] The administrative record reviewed for this case also included links to video recordings of the four sessions in which draft reports were presented to and approved by the Council. National Energy Technology Laboratory, *National Coal Council Meeting – 07/17/2020*, YouTube (July 17, 2020) ("*Coal Power* Presentation"), *available at* https://www.youtube.com/watch?v=cWAU5Mxxhts; NCC, *NCC Webcast Event 5.15.2019*, FACADatabase.gov (May 15, 2019) ("*Coal in a New Carbon Age* Presentation"), *available at* https://www.facadatabase.gov/FACA/apex/FACAPublicCommitteeDetail?id=a0zt0000001hFJVAA2; NCC, *National Coal Council WebEx-20181001 1531-1*, FACADatabase.gov (Oct. 1, 2018) ("*Coal Exports* Presentation", "*Power Reset* Presentation), *available at* https://www.facadatabase.gov/FACA/apex/FACAPublicCommitteeDetail?id=a0zt0000000j6RRAAY.

Corporation), and regularly used the first person to refer to her responsibilities under FACA. *See* Doc.35-2, AR_000230 ("we are a FACA organization"); AR_000372 ("[w]e are in the process of conducting a new report for the Secretary"). Ms. Gellici regularly led portions of Council meetings, *see*, *e.g.*, *id.* AR_000230–235, 280–283, 319–326, 353–371; she also purported to ensure the Council's compliance with FACA, for example opening the Council's meetings for public comments "in compliance with FACA." *Id.*, AR_001275.

B. <u>The Council's subcommittees</u>

In addition to the Corporation, the Council relies on subcommittees to accomplish its mission, with at least some members nominated by the Corporation. *See* Doc. 35-4, AR_003462–63, 3466, 3470, 3475–77 (Ms. Gellici proposed appointments to DOE staff for the U.S. Coal Exports, Existing Coal Fleet, and New Markets for Coal Subcommittees).

Each of the reports published by the Council during the period at issue was drafted by a subcommittee created for that purpose. *See* Doc. 35-4, AR_003454–5, 3459, 3464–65 (listing each report subcommittee's members). At the end of the drafting process, each report, including proposed recommendations and advice to the Department, was presented to the full Council for a vote.

The Council typically did not discuss, deliberate, or question the voluminous and detailed reports presented to it at its full meetings. With regard to the

recommendations contained in the Council's reports, the record shows that the Council did not ask a single question about, or make a single comment on, any of the draft recommendations it reviewed between 2017 and 2020.[4] While final reports reflected some changes from draft versions, the recommendations portions approved by the full Council in three of the four reports were identical, word for word, to the drafts. *Compare* Doc. 35-3, AR_001660–69 *with* 2089–98 (*Coal Power* report recommendations draft vs. final); *id.* AR_002454–59 *with* 2180–85 (*Coal in a New Carbon Age*); *id.* AR_002682–86 *with* Doc. 35-4, AR_003002–06 (*Power Reset*).[5]

## III.   WORC's Request

The Western Organization of Resource Councils ("WORC") is a conservation organization with membership directly affected by the domestic coal industry and the federal government's regulation thereof. Doc. 1, ¶¶ 11–18. It is

---

[4] *See Power Reset* Presentation at around 46:30; *Coal In a New Carbon Age* Presentation at around 24:00; *Coal Exports* Presentation at around 24:00; *Coal Power* Presentation at around 43:00. Out of the four reports the Council approved, on only two occasions did the presenters of the draft reports receive *any* questions at all; in both instances, a single questioner sought minor changes to a technical portion of a report. *See Coal Power* Presentation at around 43:00; *Power Reset* Presentation at around 46:30.

[5] The *Coal Exports* recommendations contained a single minor revision to the description of a waterways project. *Compare* Doc. 35-4, AR_003121 *with* 3378 (adding "and support efficient funding levels from the Inland Waterways Trust Fund" and re-wording reference to modernization project on the Ohio River in one of the recommendations).

injured by Defendants' failure to release Council and Corporation records, which would be useful to better understand how the Department and other federal agencies develop and implement coal-related policy, including the role the coal industry plays in funneling policy recommendations and financial support through the Corporation. *Id.*

On May 27, 2020, WORC wrote then-Secretary of Energy Dan Brouillette nominating a member to the Council and seeking, under FACA Section 10, publication of two categories of material produced since 2017: (1) materials produced by Council's subcommittees or any other Council entities, including subcommittee membership and minutes of subcommittee meetings; and (2) any materials produced by the Corporation and transmitted to some or all of Council membership. Doc. 1, ¶ 19. WORC also requested that Defendants open NCC subcommittee meetings to the public as required by FACA Section 10. *Id.* ¶ 21. On September 9, 2020, the Department finally responded, refusing to appoint WORC's nominee to the Council, open subcommittee meetings, or release subcommittee or Corporation records.[6] This suit followed. *Id.* ¶ 24.

---

[6] The Department's refusal to produce records to WORC that WORC is entitled to receive under FACA constitutes an injury sufficient to support WORC's standing in this case. *See, e.g.*, *Pub. Citizen*, 491 U.S. at 449 ("[R]efusal to permit appellants to scrutinize [committee records] to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue.").

## STANDARD OF REVIEW

Because FACA does not provide its own standard or scope of review, or a cause of action, this case is properly brought under the standards set forth in the Administrative Procedure Act ("APA"). *See* 5 U.S.C. §§ 701-704. Under the APA, a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A). An agency's "fail[ure] to disclose [] materials required by [FACA] section 10(b)" gives rise to a "claim under the APA." *Ctr. for Biological Diversity v. Tidwell*, 239 F. Supp. 3d 213, 228 (D.D.C. 2017).

Where an agency's administrative record is complete and contains the full set of undisputed facts undergirding agency decisionmaking (or lack thereof), summary judgment is the appropriate vehicle to address a plaintiff's claims. *See Clouser v. Espy*, 42 F.3d 1522, 1536 (9th Cir. 1994); *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997).

## ARGUMENT

## I.    The Corporation should be subject to FACA

FACA governs the operation of entities "established or utilized" by an agency, FACA § 2, and can apply even where the government objects to the application of FACA to that particular entity. *See Ass'n of Am. Physicians &*

13

*Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C.Cir.1993) (Courts may "hold[]

that a particular group is a FACA advisory committee over the objection of the

executive branch."); *cf. VoteVets Action Fund v. U.S. Dep't of Veterans Affairs*,

992 F.3d 1097, 1107 (D.C. Cir. 2021) (allowing claim against an alleged

committee over the government's objection, noting "there is no requirement that

government officials act with any particular formality to 'establish' an advisory

committee as a source of advice").

      The Supreme Court has held that the statutory term "utilize" in FACA does

not have its "straightforward" meaning," i.e., it does not apply the Act to all

advisory committees that the executive branch "makes use of." *Pub. Citizen*, 491

U.S. at 452–53. Although the Supreme Court's "ultimate interpretation" of

"utilize" was "never clearly stated," *id.* at 482 (Kennedy, J., concurring), the Ninth

Circuit has read *Public Citizen* to mean that a committee is "utilized" by the

executive branch if it is "organized by a nongovernmental entity but nonetheless so

'closely tied' to an agency as to be amenable to 'strict management by agency

officials.'" *See Aluminum Co. of Am. v. Nat'l Marine Fisheries Serv.*, 92 F.3d 902,

905 (9th Cir. 1996) ("*ACOA*") (citations omitted).

      In determining "strict management" under FACA, courts have considered

whether the group came together by its own accord as a legal adversary to the

agency, *see id.*; whether the group (rather than the agency) selected its own

members, *see Byrd v. U.S. Env't. Protection Agency*, 174 F.3d 239, 247 (D.C. Cir. 1999),[7] or whether the group ultimately answered to a different federal entity. *See Wash. Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1451 (D.C. Cir. 1994) (*"WLF"*).

This Court found at the motion to dismiss stage that the Corporation was plausibly alleged to "operate[] as a federal advisory committee under FACA" if 1) the Corporation "depend[]ed on the Secretary [] for its very existence," 2) a Government Co-Chairman "maintain[ed] authority over any [Corporation] meeting falling under FACA requirements, and all related work," 3) the Secretary "necessarily appoint[ed]" the Corporation's membership "based on the Secretary's appointment of the Council's membership," and 4) if the Secretary could "revoke membership in [the Corporation] at any time, without cause." Doc. 25 at 10–12. Those allegations of control are fully supported by the record in this case, which shows that the Corporation is indeed amenable to strict management by agency officials under FACA.

Further, because the Court determined that the above allegations, if established, would mean that NCC, Inc. was subject to FACA during the relevant

---

[7] *See also Food Chemical News v. Young*, 900 F.2d 328, 333 (D.C. Cir. 1990); *Wash. Toxics Coal. v. U.S. Env't. Protection Agency*, 357 F. Supp. 2d 1266, 1273–74 (W.D. Wash. 2004).

period, it previously declined to reach the question of whether Corporation records necessarily represent those of the Council (and are thus "made available to or prepared for" the Council, FACA § 10(b)). *See* Doc. 25 at 9–10. As discussed further below, if the Court reaches that issue here, the administrative record makes clear that the Council and Corporation are effectively one and the same. The exotic public-private arrangement that exists on paper should not shield the Corporation from being subject to FACA on the same terms as the Council.

A.    The Corporation's governing documents show it is amenable to strict management by the Department

The Corporation's Articles of Incorporation, read alongside its other governing documents and the Council's charter, leave no doubt that the Department controls the Corporation, which should thus be subject to FACA's requirements.

1.    *The Secretary appoints and dismisses every member of the Corporation*

The Corporation's Articles of Incorporation provide that the Secretary is the sole authority from which the Corporation's member list flows. The Corporation's members "shall consist of those individuals appointed to serve on the [Council] by the Secretary," they "may be terminated without cause at any time by the Secretary," and, to resign from the Corporation, a member must provide "written notice of resignation [] to the Secretary." Articles of Incorporation Art. IV.B.

16

While no court has clearly defined "strict management" for FACA purposes, the power to hire and fire has been treated as a crucial indicator of management in a variety of FACA cases, *see Byrd,* 174 F.3d at 247, including by this Court at an earlier stage. *See* Doc. 25 at 11–12 (treating hiring and firing authority as plausible allegation of Department control).

That power is also a key indicator of control in other legal contexts. The Supreme Court has treated the power to dismiss government officials as dispositive of control, because government officials must "fear and, in the performance of [their] functions, obey . . . the authority that can remove [them]." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986) (holding Congress could not retain the power to fire executive officials because doing so "would, in practical terms, reserve in Congress control over the execution of the laws"). The power to hire and fire is also a crucial indicator of an employer-employment or principal-agent arrangement. *See*, *e.g.*, *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 449 (2003) (noting the first factor in EEOC's common-law derived test for control through an employer relationship is the power to hire and fire); Restatement (Second) of Agency § 213 (1958) ("[A] person conducting an activity through . . . agents is subject to liability for harm resulting from his conduct if he is negligent or reckless in the employment of improper persons.").

Here, the Secretary's unreviewable authority to control the membership of

17

the Corporation should be sufficient to demonstrate that the Corporation is "amenable to strict management by agency officials." *ACOA*, 92 F.3d at 905. This authority clearly distinguishes this case from other instances in which courts have declined to find that an entity was "utilized" under FACA where the agency did not control the appointment of its members.

The Department has previously argued that the *authority* to appoint and dismiss every member of the Corporation is insufficient to demonstrate *actual* management. *See*, *e.g.*, Doc. 18 at 10. But this argument failed at the motion to dismiss stage, *see* Doc. 25 at 12, and should fail here as well.

The proper legal test is whether the Corporation is "*amenable* to strict management by agency officials," *ACOA*, 92 F.3d at 905 (emphasis added). An entity that is "amenable" to management by the Department is one that is "legally answerable" to the Department or "acknowledge[es the Department's] authority." *Black's Law Dictionary* (11th Ed. 2019). The fact that the Secretary holds sole unreviewable power to select or terminate every member of the Corporation is sufficient to demonstrate the Corporation's amenability to management by the Department. *Cf.*, *e.g.*, 17 C.F.R. § 230.405 (SEC regulations defining "control" as "the possession, direct or indirect, of *the power to* direct or cause the direction of the management and policies of a person," without reference to the actual exercise of that power) (emphasis added); *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880,

18

890–91 (3d Cir. 1975) (When determining control, "the courts have given heavy consideration to the power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof."); *Kaplan v. Block*, 183 Va. 327, 335 (1944) ("In construing corporate charters . . . their validity is determined not by what has been done under them, but also by what may be done.").

Further, no intermediate step exists between the Secretary's appointment of a member to the Council and their ascension to membership in the Corporation; similarly, no intermediate step exists between the Secretary's decision to terminate a member of the council and their removal from membership from the Corporation. Articles of Incorporation, Art. IV(B). Every Council member appointed by the Secretary of Energy is, "by virtue of that appointment . . . *automatically* a [Corporation] shareholder." Doc. 35-2, AR_000136 (emphasis added).

The record contains no indication that the Corporation (or anybody besides the Secretary) exercises any appointment or termination authority independent of the Secretary's decisions. Every appointment and termination of a member of the Corporation is an instance of the Secretary's *actual* control.

2.   *The Secretary controls the Corporation's agenda*

The purpose of the Corporation, according to its Articles of Incorporation, is "to advise, inform and make recommendations with respect to matters submitted to the Corporation by the Secretary of Energy on general policy relating to coal."

19

Articles of Incorporation, Art. II; *see also* 19 C.J.S. *Corporations* § 640 (2021)

("[T]he purpose clause [of a corporate charter[8]] . . . is the real measure of corporate

authority.").[9,]

Unlike in *WLF*, where the entity in question did not answer to the agency

and was therefore not considered "utilized" for the purposes of FACA, 17 F.3d at

1451, here the Corporation's sole written purpose is to respond to requests

submitted by the Secretary. The Corporation exists for the Secretary's benefit and

only operates at their direction. The fact that the Corporation's work is determined

by the Secretary's requests provides further evidence, if more were needed, that

NCC, Inc. is subject to the management of DOE.

   3. *The Corporation's work is virtually identical to the Council's*
     *work under FACA*

Beyond all that, key provisions in the Corporation's organic documents are

virtually identical to those of the Council and describe the work of a FACA

committee. Given that close identity of language, there is no reason to treat one,

but not the other, as a FACA committee.

---

[8] A corporation's charter is its articles of incorporation, construed under the law where the corporation was organized. 18. C.J.S. *Corporations* § 48 (2021).

[9] While the government has asserted that the Corporation "was incorporated to assist in handling some of the business and administrative aspects associated with the NCC," Doc. 35-5 at 10, that purpose is nowhere to be found in the Corporation's organic documents.

The Corporation's purpose is

> to advise, inform and make recommendations to the Secretary of
> Energy with respect to matters submitted to the Corporation by the
> Secretary of Energy on general policy relating to coal.

Articles of Incorporation, Art. II. Similarly, according to the Council's charter,

> The [Council] provides advice and recommendations to the
> Secretary of Energy on general policy matters relating to coal and
> the coal industry.

Doc. 35-2, AR_000001.

Further, each entity's organic document lists five additional *identical* types

of policy matters that they were founded to advise the Secretary on:

- "Federal policies which affect, directly or indirectly, the production, marketing and use of coal,"

- "Plans, priorities, and strategies to address more effectively the technological, regulatory, and social impact issues relating to coal production and use,"

- "Appropriate balance between various elements of federal coal-related programs,"

- "Scientific and engineering aspects of coal technologies, including emerging coal conversion, utilization, or environmental control concepts," and

21

- "The progress of coal research and development, pursuant to the Office Coal Research Act, Pub. L. No. 86-599."

*Compare* Articles of Incorporation, Art. II *with* Doc. 35-2, AR_000001.[10]

The joint antitrust guidelines further detail that Council staff prepares Corporation meeting agendas, and that Corporation meetings "will be conducted in accordance with FACA." Doc. 35-2, AR_000136.

On the face of the governing documents of the Corporation and the Council, there is no indication of how the Corporation's mission or work differs from the Council's—both exist to provide advice to the Secretary concerning coal policy, in the form of written reports, approved pursuant to FACA and submitted to the Secretary in response to the Secretary's requests. And, as described above, the Secretary appoints and dismisses every member of each entity, and directs the work of both entities. The Corporation operates as a FACA, just as the Council does.

---

[10] The documents each contain one purpose not included in the other. The Council's Charter additionally notes that it would advise the Secretary on "coal research, development, demonstration and commercial application pursuant to section 1301 of the Energy Policy Act of 1992, Public Law 102-486," Doc. 35-2, AR_000001. The Corporation's Articles note that it would advise on "Such other matters relating to coal as may be submitted by the Secretary of Energy to the Corporation from time to time." Articles of Incorporation, Art. II.

B.    Corporation records are inherently Council records, and therefore
      subject to FACA

Even apart from the fact that the Corporation is subject to the management

of the Secretary, FACA requires disclosure here. More specifically, FACA requires

disclosure of all documents "made available to or prepared for or by each advisory

committee." FACA § 10(b).

While courts have held that this requirement can reach documents created by

entities besides a FACA committee,[11] no court has squarely considered whether the

records of a trade association operating in parallel with an identical FACA

committee are inherently records of the committee and thus subject to FACA's

requirements. The only other court to confront this fact pattern in a different legal

context rejected the Department's position and held, under the Freedom of

Information Act, that "there is no meaningful distinction" between the Corporation

and the Council, and that allowing the Department to shield Corporation records

would permit "the fiction of a corporate entity [to] stand athwart sound regulatory

purpose," allowing a "corporate fiction [to] enable circumvention of a statute."

---

[11] *Cf. Lawyers' Comm. for Civ. Rts. Under Law v. Presidential Advisory Comm'n
on Election Integrity*, 316 F. Supp. 3d 230, 234 (D.D.C. 2018) (FACA's
requirements reach documents "intended for the committee"); *Ctr. for Biological
Diversity*, 239 F. Supp. 3d at 228 (FACA's requirements may apply to records
even if they are "preliminary" and "prepared . . . [only] for the [committee's]
eventual use.").

*Niskanen Ctr., Inc. v. U.S. Dep't of Energy*, 328 F. Supp. 3d 1, 12 (D.D.C 2018) (internal quotations omitted) (citing *Quinn v. Butz*, 410 F.2d 743, 758 n. 95, 759 (D.C. Cir. 1975)).

That logic should apply here as well, as the record shows that the Council and Corporation are identical and inseparable entities. In addition to the facts in the previous section demonstrating the near-identical nature of the two entities' governing documents, the record shows that the President of the Corporation plays an integral substantive role in the Council's work, and that Council meetings were used to manage and oversee Corporation activities.

This Court should conclude that records "made available to or prepared for or by" the Corporation are by their nature Council records as well.

1.   *The CEO of the Corporation plays a significant role in the Council's work*

The Corporation's CEO, Ms. Gellici, plays a highly substantive role in the Council's work, fulfilling the Council's core responsibilities under FACA while (to date) shielding the work of the entity she leads from public disclosure.

The inseparable relationship between the Council and the Corporation captured in the governing documents, as described above, manifests itself in the records of the Council's work. As detailed above, *supra* Section II.A., Ms. Gellici is repeatedly held out as Chief Executive Officer of the National Coal Council (rather than the Corporation); *see*, *e.g.*, Doc. 35-2, AR_000210, 249, and

frequently referred to her work as that of the Council. *Id.*, AR_000230, 372. She led Council meetings, s*ee, e.g., id.*, AR_000230–235, 280–283, 319–326, 353–371; and she purported to ensure the Council's FACA compliance, *see id.* AR_001275.

The Corporation CEO's substantive responsibilities included leading drafting chapters of Council reports, serving as Executive Editor of two reports and Principal Editor of another. Doc. 35-3, AR_001517–18, 2140, 2764. She twice presented draft reports for the Council's approval. Doc. 35-2, AR_000111; 654–55. Indeed, as noted above, Ms. Gellici's is by far the most common name in the administrative record, which ostensibly contains only *Council* records, because the government refuses to produce Corporation records.

The highly substantive leadership role that the Corporation's CEO plays in the Council's business belies the government's depiction of the Corporation as an entity that merely "provided administrative assistance and support to [the Council]." Doc. 35-5, ¶ 26. Instead, the record suggests that the Corporation's work was the Council's work, and should be subject to FACA on the same terms.

> ## 2. *Council meetings moved seamlessly between Council and Corporation business*

The record in this case shows that portions of Council meetings were devoted to matters solely in the ambit of the Corporation, with no statements or indications to those gathered that the Council's meeting was over (or suspended) while Corporation business was attended to.

As detailed above, Council members received presentations from the

Corporation's finance officials about the state of the Corporation's finances and the

financial benefits that would accrue to the Corporation from expanding Council

membership. *See*, *e.g.*, Doc. 35-2, AR_001266–67, Doc. 35-3, AR_001488–89.

Assuming there is no reason that the state of the Corporation's finances was

relevant to the Council's work, the record shows Council meetings flowing from

clear Council business to Corporation business and then back to Council business

again—without acknowledgement that meeting attendees changed the capacities in

which they were convening. The two entities were treated as one and the same by

their members and should be treated as such under FACA.

## II.     The Council's subcommittees should be subject to FACA

The Council relies on subcommittees to accomplish its work, and the record

in this case shows that the Council is precisely the sort of "rubber stamp" that GSA

regulations consider impermissible where the subcommittees themselves are not

subject to FACA's transparency requirements. 66 Fed. Reg. 37,728, 37,729 (July

19, 2001). As this Court noted at the motion to dismiss stage, a "lack of . . . any

substantive discussion, revision, or amendment" of a subcommittee's reports by

the Council indicates that "the council attempts minimum FACA compliance by

surfacing its reports for 'finalization' only after the Council's subcommittees have

26

performed the substantive work of composing the reports in their entirety." Doc. 25 at 18.

As described above, *supra* Section III.B, the record in this case captures an extraordinary paucity of engagement by the full Council with subcommittee recommendations prior to their approval.

None of the Council's reports received a single question or comment about its recommendations; all recommendations were "adopted by the parent advisory committee without further deliberations by the parent advisory committee." 41 C.F.R. § 102-3.145. With one small exception about the description of a waterways project, *supra* n.5, the recommendation portions of final Council reports were word for word identical to the drafts the Council received. The Council's subcommittees generated "substantive recommendations," which were "accepted wholesale" by the full Council. *Elec. Privacy Info. Ctr. v. Drone Advisory Comm.*, 369 F. Supp. 3d 27, 46 (D.D.C. 2019).

Under these facts, FACA requires public access to subcommittee deliberations and related documents because they "provide the framework, context and information that the [Department] will rely on in making policy decisions." *Heartwood, Inc. v. U.S. Forest Serv.*, 431 F. Supp. 2d 28, 35 (D.D.C. 2006); *accord Drone Advisory Comm.*, 369 F. Supp. at 46 (subcommittees not subject to FACA where full committee "suggested changes to [the subcommittee's]

recommendations . . . and where some of the more contentious . . . recommendations received extensive discussion").[12]

The need for transparency is amplified in the context of the Council's unusual structure. As described above, some Council work already goes on behind closed doors, undertaken by a Corporation claiming to be a separate entity shielded from FACA. A Corporation member also led some of the work that is ostensibly being delegated to the Council's subcommittees, Doc. 35-3, AR_001517–18, 2140, 2764 (capturing Ms. Gellici's various roles in preparing Council reports), and the Corporation originates many of the appointments to the Council's subcommittees. *See* Doc. 35-4, AR_003462–63, 3466, 3470, 3475–77. Just as the lines between the Council and Corporation are hopelessly blurred, so, too are the lines between the Corporation and the subcommittees, and the work of the subcommittees should be opened to public scrutiny.

---

[12] In *WORC v. Bernhardt*, Plaintiff argued that a committee's subgroups fell under Section 10 because the full committee "fail[ed] to respond to public comment following the presentation of certain [subgroup] recommendations." 412 F. Supp. 3d 1227, 1241 (D. Mont. 2019). The Court rejected that argument, declining to review " all the recommendations made by the different subcommittees . . . to determine on a case-by-case basis whether a nebulous level of 'deliberation' occurred." *Id.* Plaintiff respectfully disagrees with this conclusion, but, in any event, the court's holding does not apply where, as here, the advisory committee rubber-stamps *all* the recommendations without any discussion or debate: review of those recommendations does not depend on the "case-by-case" determinations disfavored by *Bernhardt*.

**CONCLUSION**

The Court should grant Plaintiff's Motion, and, consistent with FACA's requirements, order the Department to disclose materials produced for or by the Corporation or the Council's subcommittees between 2017 and 2020. If the Department does not do so promptly, the Court should enjoin operation of the Council and its reliance on the Corporation or subcommittees until the Department has complied with FACA, as well as order any other appropriate relief.

DATED this October 20, 2021.

/s/ Shiloh Hernandez
Shiloh Hernandez (MT Bar No. 9970)
Senior Attorney
Earthjustice
Northern Rockies Office
313 East Main Street
P.O. Box 4743
Bozeman, MT 59772-4743
T: (406) 586-9692 ext. 1929
shernandez@earthjustice.org

/s/ Aman George
Aman George (D.C. Bar No. 1028446)
(admitted *pro hac vice*)
Senior Counsel
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
T: (202) 701-1783
ageorge@democracyforward.org

*Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), I hereby certify that the above

memorandum contains 6,497 words, excluding the caption, certificate of

compliance, tables of contents and authorities, and signatures.